And I will take this occasion once more, unfortunately for the last time for this sitting, to thank Judge Eugene Saller from the Sixth Circuit Court of Appeals for very graciously and expertly giving us his services and his time to help us out with these cases. You're welcome. First matter is Lincoln, or only matter is Lincoln Mercury v. Ford Motor Company. Good morning, Your Honors. Morning. I'd like to reserve, if I could, three minutes for rebuttal. Sure, okay. Your Honor, this is an appeal from a preliminary injunction entered by the District Court that prohibited Ford from continuing to include a $157 charge on the wholesale price of vehicles sold in New Jersey to these plaintiffs. Right, and there's some dispute about the standard of review here, but the underwriting thing that we have to decide is basically a legal review of a rule of law, so I'm not certain why we wouldn't have anything other than plenary review here. Your Honor, I agree with that 100%. Okay. I believe the standard of review on the issue that matters here is plenary in this Court. Okay. The District Court held that the $157 charge was barred by operation of NJSA 10-15A. We generally are referring it to the warranty reimbursement statute. That would be helpful, yes. Let me just ask this, to make sure I understand the nuts and bolts of this thing. The 40% markup, where does that, and I know that's not what's involved necessarily here, but I was trying to think, and there's really no explanation in the papers, where does that come from? Is that just the normal average cost of the part, the storage, the transfer, getting the part from the person who made the part, the manufacturer to the dealer? But how is that 40% figure? The 40% is the standard. The standard retail rate. Where does that come from? No, it's not standard retail rate. It's the standard markup under warranty for parts around the United States. Okay. What generates that 40% markup? It's the way they price it in order to deal with the cost generally. At one point it was $35, at one point it was $30. It went up to $40 in, I believe, the early 90s, and it's been at that level since then, and it's been at that level not just for Ford. This isn't in the record. Well, actually, it may be in the record for purposes of the amicus briefs. The 40% level of deals with most other manufacturers as well. I can't tell you precisely how the 40% is determined. I can just tell you that it is the standard warranty markup for parts in the absence of these sorts of statutes where these statutes don't exist. Is that what most dealers would mark it up if they were making the repairs themselves? At retail you mean, Your Honor? Yes. No. Clearly, the dealers at retail mark them up significantly higher, which is the reason why we have the issue under the statute. The statute says you have to pay retail for the parts used in warranty, and most of the dealers, for example, Liberty, which is the one that's been around the longest in this continuing saga of litigation, their retail markup rate was 77%. I'm not sure what it is today. There are some that could be 80. There are some that are over 100. The numbers just come out of thin air. That's why I was wondering what drives those numbers. The retail markup rate, Your Honor, is established as a result of an amendment to the statute in 1999 that gives a mechanism for determining the retail rate. It's based on either 100 consecutive repair orders or 90 days' worth of repair orders at retail, and the statute now allows you to do it on an average rate, average retail. Originally the statute required it to – well, the argument was the statute required it to be done at a part-by-part basis, and the statute was amended in 1999, frankly, after Liberty II. Liberty II, to state the obvious, is critical to this case. Liberty II is, in our view, what drives the mistakes that the district court made. It seems to me the district court assumed or concluded that under the New Jersey statute the manufacturer has to eat the cost, at least the additional cost between the retail and the warranty, whatever that difference is, that the manufacturer has to eat that. That's what the district court seemed to assume in adjudicating this case. I would say, Your Honor, that the district court assumed that the manufacturer could not, at least, do a wholesale price increase in the price of vehicles on a statewide basis. The plaintiffs in this case suggest that the way to recoup it is through a nationwide increase. Our position is, obviously, that the statute at issue here doesn't address it at all, that the language of the statute, particularly given what the – well, let me step back. I mean, our position first is that under Liberty II, this court, when it said these statutes, like it was talking specifically in the context of the First Circuit's decision in Acadia, said these statutes, the direct words were, at issue, do not preclude cost recovery affected through wholesale price increases. That's what the Second Circuit – excuse me, that's what the Third Circuit panel decided in this case – not this case, the earlier case, Liberty II. And our position, as articulated here, is that that was a holding. It wasn't dicta. It was that language and the reasoning that came before it and came after it was a holding, and that holding bound the district court. And the district court, respectfully, got it wrong when it concluded it had the opportunity to reach a different decision in this case. The cost recovery program that was in place here by Ford and the cost recovery program that is in place as reflected in the MECAS briefs by a number of other manufacturers that's been in place in New Jersey since Liberty II is completely consistent with Liberty II and completely consistent with the nationwide – I'm sorry, the statewide cost recovery plan that the court said there was okay. In addition, in 1999, another district court in New Jersey, Judge Cooper in the N.J. Carr's case, looked at Liberty II in the context of another case and said the Third Circuit unequivocally held – no, I'm sorry, wrong word – unequivocally declared that cost recovery under the New Jersey statute was not prohibited. The district court ignored the Second Circuit's decision – well, it didn't ignore it, obviously. It tried to reconcile it in some way. But respectfully, I believe that the district court was bound by that. Even if the district court wasn't bound by it, the reasoning that's reflected in Liberty II is absolutely accurate and correct. That is to say that – Even if it were not correct, we would be bound by it. You know, I'm very reluctant to suggest that judges are required to do anything. That's not – like suggesting my wife is required to do something. That never works out well for me. But I do believe under the court's internal operating procedures, as well as case law, the panel is in fact bound by Liberty II. If you conclude you're not, if you conclude you are permitted to go ahead and look at this anew, I would suggest, Your Honor, that the reasoning that's reflected in Liberty II is really correct. There is nothing in the language of the statute that reflects an intention to regulate cost recovery mechanisms for this warranty increase. Let me ask – let's assume just for a second that the – I know it's a gigantic leap for you, but just assume the district court is right. From the manufacturer's view, how would the manufacturer recoup the cost of the repair? I suppose there are a variety of ways they might do it. They might do it nationwide. In other words, they could do something that would increase the price nationwide. If they did that, Your Honor, I would suggest that there are certain constitutional issues involved, commerce clause issues and things like that. But you could always increase it across the board. That's what I mean by nationwide. You could spread it throughout the United States. You could say the consumers and the folks in Pennsylvania should be paying for what's going on in New Jersey. But that's really the same thing we have here, where Essex County in a sense is paying for what's going on in I don't know very many counties in New Jersey, but another county in New Jersey. It's a nation – the same principle is at issue here. It's just not – the spreading is not going nation C to C. It's going from the Atlantic to Pennsylvania. From Cape – from Cape Bader, Bergen County. Right. And, Your Honor, I would suggest that under the language of the statute, that's perfectly permissible. The Third Circuit, when it looked at this in Liberty II, concluded, you know, when it was analyzing Acadia, in Acadia there was obviously that was a main statewide recoupment system. It said that was okay. And, you know, when you look at this, Your Honor, I would suggest that there are – there are a variety of ways a manufacturer might recoup or price in order to cover this expense. The question isn't that. The question really is whether what they're doing isn't permissible under the statute. And I would say, Your Honor, that the language of the statute doesn't address it at all. I think in large measure what's going on here, if you kind of step back and look at it, there's an underlying assumption that the court, the district court, perhaps the plaintiffs, they believe that if this issue was in fact presented to the legislature in New Jersey, they know how it would come out. The district court referred to it as plugging a loophole. The plaintiffs and their briefs refer to this as a loophole under the statute. And what's really happening here is that there's this assumption that, you know, we know what the New Jersey legislature would do here if they looked at this. They would say you can't do it. And I would say, Your Honor, two things about that. I'm not so sure. Okay? I'm not so sure. There has been a history here of New Jersey legislative reaction to events occurring judicially under the statute. I referred earlier to 1999 when there was an amendment. The statute was amended in two ways in 1999, both times directly responsive to things that happened in this court or in the district court. In one instance, this court in Liberty II, the part of the case we don't talk about as much, but it dealt with a reversal of the district court's decisions on things dealing with how you calculate the retail rate. And this court concluded that what the district court did there was wrong and said essentially the part-by-part analysis is the correct analysis. What happened? A year later, the statute was amended to eliminate that as a possibility. In Liberty III, a case we don't talk about that much in this string of cases, the district court in Liberty III concluded that this statute doesn't deal with service contracts. It only deals with warranties. A year and a half later, the statute's amended to deal with warranties, to extend it to service contracts. Since 1998, this statute has been interpreted by this court and by the N.J. Carr's case as not inhibiting statewide recoveries, in fact, allowing that as a mechanism to recoup. The New Jersey legislature has never taken any action on that. So why is it that we assume the New Jersey legislature would actually do it this way? Apart from the fact that obviously it's not the function of the court. Again, I'm reluctant to suggest what the court's function is, but it's not the function of the court. But you're right. This is not something we can really consider in our analysis. No. You can consider this absolutely. What I was about to say is that it's not the court's function to fill loopholes in a statute. That's correct. It's the court's function to interpret the language of the statute and, when necessary, the legislative history. But here I don't think you need to get to it. But certainly just because someone believes that they think they know how the legislature would turn out here if it went to it, that's no reason to drive the result. Besides the history of non-action in the New Jersey state legislature, I'd hit something else. The world has changed since this statute was adopted in 1977. And I don't just mean because the Phillies won the World Series. I mean it's changed a lot. And every day you see reports of quarterly losses in the billions of dollars for American automobile manufacturers. And I'm not suggesting it's rosy for dealers. It's not. But whatever the social things that may have driven this statute initially, I would say don't exist or has significantly changed. And it may well be that if this issue goes back to the New Jersey legislature where respectfully it belongs, the result is not a foregone conclusion. The result is not necessarily the case that the New Jersey legislature would say, you know what, the manufacturer is the one that needs to absorb this cost or it needs to be done in some other way. I would suggest that that's the kind of legislative fact-finding, the legislative process that needs to go forward here. Because what the district court did here, as I said before, and as it candidly kind of admits, was filling what he thought, the judge thought, was a loophole. And respectfully, Your Honors, I do not believe that's the correct function of the court in this case. For those reasons, Your Honor, we would ask that the district court's order be reversed. Thank you very much, Mr. LaFrerie. Mr. Chase. Good morning, Your Honors. My name is Eric Chase. I represent the plaintiffs in this case. Let me start by saying my very good friend of many, many years, Mr. LaFerriere, is just dead wrong on the law. You know, the attack is a judgment too strongly after you've said that he's your very good friend. And indeed he is. You're impugning yourself with that. We're very good friends from a long time ago. What's wrong with what we said? How is what the district court did here consistent with what we said in Liberty 200? Specifically, reading from Liberty 2, we agree with Acadia's holding that the statutes at issue do not preclude cost recovery systems effected through wholesale vehicle price increases. That's on 564 of the Acadia 2 opinion. What they cannot do is do it discriminatorily within the state. In other words, in New Jersey, the Ford dealership. Well, why can't they? What in this statute says that belief has to be spread nationwide? And what in Liberty 2 said? You've got to spread the cost nationwide. There is nothing in Liberty 2 that suggests they can avoid other laws that would come into play here. For example, Robinson-Patman. New Jersey dealers compete with dealers across the rivers in New York, Pennsylvania. And what they're saying is they can simply raise the price for New Jersey dealers only. And Judge Bassler obviously saw that kind of issue. What the state statute says in clear terms is that Ford and other manufacturers shall reimburse the dealers at retail if the dealers ask for it. And they have in many cases. In subsection C, it says without reduction, unequivocal. Now, Ford says section C only deals with the Lemon Law because it refers to the Lemon Law. It is not true. It refers to all of subsection A, which says shall reimburse at retail. When you say without reduction, you're talking about without reduction in price of the car or without reduction in price of the part? Without reduction to the retail price that they have to pay under subsection A. The price for what? The part that's used in warranty. And if I may, Your Honor, Your Honor had a great opening question to Mr. LeFour. If I could go back for that for a moment. The court's question, as I understood it, was where did the cost plus 40 come from? Ford across the country establishes a rate to pay dealers for parts used in warranty at cost plus 40. It vigorously wants to just pay cost plus 40 across the country, even though cost plus 40, as Ford admits, is way below retail. In fact, Ford has an MSRP. That's its suggested price. Ford has explained to us that on average their MSRP for these parts is cost plus 63%. So they're saying the suggested retail is an average of 63%, yet they want to reimburse dealers at cost plus 40. This statute says no. It's at retail without reduction. But aren't they doing that? Aren't they, as I understand it, aren't they basically computing the sales in New Jersey and spreading the cost of warranty repair using that increase, taking what it would cost to repair the part at retail, taking that increase and placing it on every vehicle sold in New Jersey, everybody who buys a car in New Jersey, in a sense, is subsidizing the warranties that are on the new cars. Isn't that basically what they're doing? Not at all, Your Honor. As Judge Barry described when she was a district judge, way back at the beginning of the first Liberty case, it's a shell game. And it's a shell game because what they are doing, Your Honor, is they're taking a regulatory and statutory obligation that they have, which is to pay the dealer's retail for warranty labor, which is not an issue here, they pay that, and warranty parts where they insist on paying what they do on a nationwide basis, no matter the dealer's situation, no matter the profitability of dealers. And a footnote to something my friend Mr. LaFura said about how times have changed. Well, indeed they have. Lots of Ford dealers, including in New Jersey and elsewhere, have gone out of business. Well, but if you're right, Ford being out of business, if they can't spread this cost somewhere, if they have to absorb it, even nationally. Ford may go under with that. Your Honor, here's the way that it can be done legitimately and without a commerce clause issue. Instead of essentially forcing the dealers to subsidize Ford's warranty with the customer, instead of doing that, they can simply raise the invoice price nationwide. That's one way of doing it. We aren't insisting that that's the way they do it. But what they can't do is essentially, and this is in Liberty too, what they can't do is take the dealer's money to pay the dealers. That's what they're doing here. They're saying, in effect, in a circular fashion, in a shell game fashion, as described by Judge Barry, they're taking the dealer's own money and paying the dealers with it so that they can pretend that they're complying with a statute that says shall reimburse at retail. But there's more money going to the dealer because the price has been increased by the, I assume if this thing works correctly, the price has been increased by an amount which is roughly equivalent to over time the retail cost of the repair parts involved in servicing the warranty. They pay that, and then they take it back, and discovery has proved conclusively, and it's in the papers, and I know Mr. LePure isn't going to deny this. What they do is they impose this surcharge on New Jersey dealers only so that on average they're paying costs plus 40 in New Jersey, and thereby avoiding the statute entirely. How is that different than what was done in Maine under the Maine statute? Isn't that exactly what was done under the Maine statute that we said was okay in Acadia II? It is spread statewide because, and we use the term regulated transactions, the retail sale of the car is not a regulated transaction under the statute. If they want to take the increased cost to Ford because of paying retail for the warranty part and spread that out over every car sold in New Jersey slash Maine, what's wrong with that? Acadia, of course, is no longer meaningful at all because Maine now does exactly what New Jersey is required to do. That is the manufacturers pay retail in Maine without reduction. But Liberty II is still relevant to us. Liberty II is relevant, and Liberty II, according to this court, said we distinguish Acadia in part on the grounds of the purpose of the legislation where the emphasis in Acadia was on the consumer. There is an emphasis here, and the legislature said it, that the manufacturers, including Ford, can't walk away from their warranty. They're required to pay that price. It's an incentive. How are they walking away from the warranty here? By making the dealer subsidize their warranty. The real cost of the warranty is, in essence, a benefit to the consumer, but instead of Ford abiding by its commitment to the consumer, which is the warranty, to be sure, is a contract between Ford and the consumer. The dealer is not party to that contract. But isn't the dealer getting more money for the car, depending on the individual negotiation, because the sticker price doesn't mean anything? But isn't the individual dealer getting more money for the car when the dealer sells the car because the surcharge has been tacked onto the car's price? No, Your Honor. In fact, that issue has arisen back and forth, and we rely on the Hanover Shoe case at 392 U.S. 481, the 1968 U.S. Supreme Court case, which takes care of that passing on argument that Ford has made all along and has presented to this court. The violation, as Judge Bassler ruled, was at the time that they surcharged. The dealers don't pass it on. The dealers get what they can in the negotiation process, and anecdotally, Your Honor, these days consumers are getting huge discounts, so there isn't a lot of profit, and there never has been, built into the sale of the new car. If New Jersey had a law that required pollution control devices on all cars that cost $100, could Ford require all New Jersey dealers to pay $100 more per car? Well, if there's a requirement that— In New Jersey only, and then they require New Jersey dealers. That's pay $100 more as a surcharge. Interesting analogy to California. Right. They don't do it. They don't do it in California. Well, could they do it in New Jersey, whether they do it or not in California? Your Honor, I don't know the answer to that question, but if there's an added specific cost, it could probably be itemized as an added specific cost of an item that's in a car that wouldn't be in another car, just as with options that the consumer— raised like they did here. Does intent—does it enter into this at all? Intent is not the issue, Your Honor. It's what they did. So they can just add $100 more per car because New Jersey requires these pollution devices. I think what they would have to do, thinking about it now for the first time, if they did a California-type thing and wanted to bill for it, I think they'd have to put it on the dealer invoice and on the Moroni sticker. And, Your Honor, this is an important point. This added cost— You said the Moroni sticker? The Moroni sticker is the name in the trade for what you see, Your Honor, when you go into a dealership and it's on the car. Oh, that's the show game. That's where the show game is, what they tell you the car is going to be sold for. I'm sorry, go ahead. By federal law, the Moroni sticker has to be shown on the car. And there really is some valuable information on the Moroni sticker. You do see the MSRP, which is the suggested retail price. You do see an itemization of what comes with the car without added cost. You see the things that are added on as options. And in response to Judge Seiler's question, perhaps under the circumstances and the hypothetical, if you listed that as an added item, whether it's required by law or an option chosen by the consumer, you could list that as an added price. Interestingly, List the warranty surcharges as an added price? It is not, Your Honor. No, but I'm saying, you're saying you could do that? You can't, Your Honor. It's illegal to do that. Okay, I thought you said you could do that. No, you can't do that. And, in fact, Your Honor, all through this case and today, if Your Honors walked into a Ford dealership and looked at the Moroni sticker, Ford says to the consumer, this is to you at no added cost. So if the dealer did what Ford wants to argue the dealers did, they don't, but if they did, they'd be violating the representation that Ford makes to consumers right on the Moroni sticker, which says at no added cost. This warranty comes with the car, and you don't pay extra for it. It's built into the cost of the car. I think this is a fairly simple matter of statutory construction. I think Liberty II had it right. Your Honor, what you just said, you said that this warranty comes with the car. You don't pay extra for it. It's built into the cost of the car. How can those two things be right? They can't both be right. If you say you don't pay extra for it, it's built into the cost of the car, well, absent that being built into the car, the price would be lower. So they're not paying extra for it. It's already there. In other words, Your Honor, if you look at the Moroni sticker, you won't see anything showing the price of the warranty. The warranty comes with every car, no matter how much you pay for it or how little you pay for it. You can't bargain it away. It's going to happen no matter what. It's yours to consumers no matter what. No consumer can say, I'd rather not pay for the warranty. Let me just have the car as is without it. Cannot do that, and Ford, like other manufacturers, says right on that sticker to every consumer who purchases or releases a car, it's at no extra cost to you. So in wrapping this up, Your Honors, our view is this is a very simple matter of statutory construction. It's not a matter of going back to the legislature. The statute says what it says. It says at retail, without reduction. What Ford has done is maneuvered around this rhetorically, and frankly, it's just wrong to do this. Not morally wrong, but statutorily wrong. If New Jersey passed a law that required a lifetime warranty on all vehicles to be absorbed by the manufacturer, could Ford lay a surcharge on dealers in New Jersey? I mean a lifetime for all moving parts and all those things. I don't know the answer to that because, Your Honor, see, if they do that, that's between Ford and the consumer. The warranty is a contract between Ford and the consumer. The way the dealer gets implicated. Well, New Jersey could require it. New Jersey, I suppose, could require it. I expect we'd have a few Commerce Clause issues from my friends. Yes. If they did that, how can they charge that to the dealer who's not even a party to the warranty? Doesn't it, Your Honor, I ask rhetorically answering my own question, doesn't it have to be between Ford and the consumer? Don't they have to build it into the basic cost of the car rather than say, okay, we're required to give the consumer a lifetime warranty and we'll have the dealer defray some of these costs, the dealer who is not even a party to that contract. This case is only, what, half over? Do you still have your Patman issue to try? We have the Robinson-Patman issue, which has not been addressed yet, and we have damages. Liability is established as it now stands. That's being challenged here, of course. So this isn't finalized to all issues? Correct. Why should we address the summary judgment now, piecemeal? Why should we do that? Our position is that you should not, and we've argued that. Judge McKee, that's in response to Your Honor's question, isn't this a plenary review? If you do address the legal question, of course it's plenary, but our point was, Your Honor, that we were saying this is far from final. This is up here on consent. There was no hearing about the injunction. It's here because it's an injunction. Okay. Let's move to that then. We're just talking about money here. Why does this pry out for equitable relief in any fashion, and why is it just not calculable at some point down the road and comes out in the form of some sort of damages or no damages? That's our argument, Your Honor. We have made that argument that this matter should be sent back for completion in all respects. But why should your – you requested a preliminary injunction on this thing after you got your summary judgment, but why is that not calculable later on so that there's no irreparable – I understand the point. Okay. Your Honor, when Judge Bassler found that it was illegal from the get-go, violated a statute of New Jersey, we took the position that they couldn't have a continuing illegality, and we were prepared to go to court on that. Instead, we worked out a consent order entering the injunction. But I think it now flips the issue. We have the situation where they are charging a surcharge not just to the plaintiffs, but anywhere in New Jersey. So now they're paying retail just as they are in Maine. So I ask the reverse question. What's the emergency now? Why not the status quo where they are paying retail until the end of the case? What's happened to the price of the cars in the meantime? And there's a charge. You're saying there's a surcharge that's not being enforced because of the injunction. Has the price of the car gone down in New Jersey? Your Honor, that's a great question. The prices of cars— Come on over to New Jersey and get a car. That's the case. Before we rule. The prices of cars generally, especially in the big three brands, are way down because they're offering huge incentives. But that has to do with the economy, and I don't think it has anything to do with today's issue. Thank you very much, Your Honor. Thank you. By the way, it is refreshing to see friends addressing friends rather than beating each other. Yeah, it really is. You have to search for weapons on some of these. It really enhances the entire system. That is exactly right. If you won't take too much of my three minutes, Mr. Chase and I actually first met probably in 1977 or 78 or thereabouts. I was clerking for a district judge in New Jersey, and Mr. Chase was an assistant U.S. attorney, and he was in our courtroom all the time. And then as soon as I finished my clerkship, one of the first cases I had was with Mr. Chase. I represented a motor vehicle manufacturer. He represented a dealer. And from 1979 or so until this day, I don't think there has been more than a week where we haven't had a case where we've been at versus each other. And we have, in fact, over the years become extremely good friends. I assume we should not infer anything from said U.S. attorney. It may not have been the criminal side. It may have been the civil side. But if it was the criminal side, the fact that he now seems to be representing car dealers. No, no, no. He was doing tax work. I'm glad you cleared that up. That would have been a cloud hanging over this case. Your Honors, Mr. Chase addressed a lot of issues and made what I believe to be incorrect points with respect to many of them. I don't have that much time, and before I go to those I'd like to address the jurisdictional issue. Let's call it that. You may have noticed that there's been those swords swooping down from the ceiling when persons continue to talk beyond the red light. So if you need a little more time, you should feel free to take that. Thank you, Judge. With respect to that, to me there's sort of a legal analysis and there's a practical analysis. The legal analysis is that it's a preliminary injunction under 1292A. It's immediately appealable under the standards of review that are appropriate in this court. I don't have a problem with the jurisdiction on the equity side. I have a problem with whether this is an equity-type case. But the problem is that we're splitting up. The case is not over. Your Honor, most respectfully, that's the case in every preliminary injunction case. The case is not over. There's still something to go forward in the district court, yet it's appealable. And if the injunction itself rests on a question of law that's not the subject of a fact dispute, the court has the ability to get to it. Again, these requirements I hate to refer to. There's another case in the Third Circuit that says if it's based on an error of law, the court's required to reach it. Okay. Now, all right. Now, as I said, I don't have a problem with addressing whether equitable relief is proper in this situation. Yes. And the preliminary injunction. But there's a summary judgment that only decides half the case. So the basic case below is only half over. It's not final as to all parties and all issues. Your Honor, I agree with that. I'm going to repeat myself to some extent. That's true with every preliminary injunction. That's an issue really for Congress. We're talking about legislatures under 1292A. It's always the case. There's always half the case left. But you're asking us to address the summary judgment, are you? I am. And I am asking you to address it because under the standards that are applicable in this court, this court has the power and the ability to do it. Let me talk specifically about this may be relevant to the scope of review issue because on the other elements of the preliminary injunction, when you're balancing probability of success, irreparable injury, balancing of the harms, public interest, on that it's an abuse of discretion, the review, the standard of review. On the underlying legal issue, it's a plenary review in this court. So what you're really doing with respect to balancing of the harms or irreparable injury is reviewing Judge Bassler for abuse of discretion. He specifically found in his order, which is in the appendix obviously, that all of the requirements necessary for preliminary injunction had been satisfied. He found that there had been irreparable injury. And in this court, no one is saying there's not. The plaintiff has never argued that any of the requirements for a preliminary injunction have not been satisfied. Indeed, it would be bizarre in the extreme if we were in this court and the plaintiff having asked for a preliminary injunction now comes back and says, but wait a minute, some of the elements of the preliminary injunction in the district court weren't satisfied. And there's a practical piece to this, if I may, for a minute, and that is as follows. You know, Mr. Chase is correct. We were in the district court. The court had found that this $157 charge was no longer valid. It was illegal under the statute. At that point in time, Ford was perfectly within its rights, given the status of the litigation, to continue to charge the $157 on every invoice for every dealer in the state of New Jersey. Nobody had asked for any injunctive relief. It could still do that. The issue comes up. We want an injunction. We want you to stop. Okay? I suppose I could have responded to that with something that said, absolutely not. We're going to have to go to court. You're going to have to litigate every issue. You're going to have to show A, B, C, and D, and I'm going to fight it to the death. I could have done that, I suppose. Practically, it made no sense. It made no sense because what Judge Bassler had already decided. I would suggest, Your Honors, if you decide in this case that this was inappropriately, by the way, it certainly wasn't consent. The only thing we consented to was not posting a bond. If you come out with a decision here that says this wasn't properly appealable, I would suggest that the next time this kind of situation arrives, my reaction would be, hmm, I'd really like to do this, but I read Liberty 4, which is what this one will be, Liberty 4. I read Liberty 4, and if I do that, I'm in real trouble. I can't do that. I have to fight this tooth and nail, even though it doesn't make any sense. That's kind of my view with respect to the issue. I don't think you've cured my ignorance yet. Well, let me try again. What I'm saying is I have no problem with addressing the preliminary injunction. They're always here mid-trial because they're preliminary. I agree. Okay, we have an underlying half case done. Why should that not wait until the whole thing is decided, as we do in all other cases? All issues decided. Because, Your Honor, and I did say this, and maybe I'm just not connected, because the case law in this circuit says that if the preliminary injunction, the thing that decided half the case comes up here, and it's based on an issue of law, and the district court was wrong on the issue of law, this court has the ability, indeed, under Coos Pharmaceutical, it has the obligation to review it and reverse it. That's the answer to the question on that issue. My time is up. Can I just take a couple more minutes here? And then if I go too long, obviously, I'm sure you'll tell me. I just want to address a couple of these other issues. You know, the court asked Mr. Chase a couple of times about where is it in the statute that it deals with the inability to spread these costs. And what Mr. Chase said is, well, they can't discriminate. The Robinson-Patman Act is involved somehow. The Robinson-Patman Act, going back to our prior conversation, hasn't been decided. That claim is still in the case. No one has found that there's been a violation of the Robinson-Patman Act through this surcharge. Your Honor, you asked a number of times questions about essentially the California emission control issues and could the State of New Jersey do this and what would happen in those circumstances. Well, the answer with respect to the California emissions situation is fairly clear. The case law has indicated that, in fact, that could be recouped and passed on to the beneficiaries of the legislation. It's not done in some measure because over time what's happened is that those California emission requirements have been adopted by lots of other states and the cars that are produced typically satisfy them in some measure. So there's no reason to do it under the California emission standards issues. Mr. Chase refers to Judge Barry's language in the Liberty II trial court about the shell game. That, so we're clear, that was a reference to the surcharge procedure that was in place in Liberty II that Judge Barry found was invalid and that the Third Circuit. It was a way of reducing the reimbursement. Correct, and the Third Circuit agreed with Judge Barry. She was referring to that, not this. This is the surcharge or the cost recovery system that is completely consistent with what the Second Circuit said could be done. Indeed, you know, we haven't talked a whole lot about stare decisis and those kinds of issues, but let's keep in mind that, or I'd appreciate it if everybody would keep in mind, that there are a lot of motor vehicle manufacturers in the state of New Jersey who have been doing exactly what Ford has been doing since 19, well, I can't, the dates aren't in the record, but the amicus briefs identify what they've been doing and how long they've been doing it. Mr. Chase referred, there was a question asked about Maine, and Mr. Chase said, well, Maine now is consistent with New Jersey. Take one big step back and recognize that's because Maine amended the statute. The Maine legislature, after Acadia and after some other cases, looked at it and specifically said, we want to amend the statute. That's precisely what I think needs to happen here. I think what needs to happen here is that if the state of New Jersey wants to do this, it has to go back to the legislature. The pass-through. You know, you had some questions about what happens with this charge. Do the dealers absorb it or don't they? Two points on that. One, Judge Bassler made no decision with respect to that, and I would also suggest that for purposes of this argument, where we are now, I'm not sure it's particularly relevant. But the evidence in the record, and we've cited it in our brief, primarily the reply brief, is really unequivocal that, in fact, these charges were, when they were being assessed, are passed on or were passed on to consumers and to salespeople. Monroney stickers. A lot of talk about Monroney stickers, and this will be my last point in the absence of questions. I would urge your honors to recognize that in Acadia, the district court in Acadia had concluded that it needed to be on a Monroney sticker. The First Circuit said, no, that was wrong. It doesn't have to be. There's nothing about the absence of this on a Monroney sticker that prevents a dealer from recouping the cost. Indeed, the evidence is unequivocal that they do. In the absence of questions? Thank you. Thank you very much for a very helpful and very expert argument. I want to echo what Judge Naggard said. It's a pleasure to preside over a case where you have two exceptionally competent and articulate and forceful advocates who have a mutual respect for one another. It just, I can't tell you the difference between coming into this kind of an argument and coming into some of the ones we got into, where you think you're walking into the middle of a World Wrestling Foundation wrestling match. So I want to commend both of you for the way you conducted yourselves and the real thorough manner and helpful manner in which you've briefed and argued the cases. Thank you very much. Thank you.